NEMASKET MILLS *vs.* CITY OF TAUNTON.

Bristol.    March 6, 1896. — September 8, 1896.

Present: FIELD, C. J., HOLMES, KNOWLTON, MORTON, & BARKER, JJ.

*Waterworks — Statute — " Natural Flow " — Damages — Petition.*

The St. 1875, c. 217, entitled "An Act to provide the city of T. with pure water," authorized in § 1 the taking of the waters of either T. River, or E. and A. Ponds, "provided, however, that if said city of T. take water from said A. Pond the said city shall construct and maintain a dam at the place where the A. Pond flows into N. River, not exceeding two and one half feet in height above the mudsill as it now exists at said place; and provided, further, that if said dam shall not retain sufficient water for one year's supply for the city of T., then said city shall have the right to, and shall, raise said dam to such a height as will retain sufficient water for one year's supply for said city of T. It is also provided that the natural flow of said A. Pond into the N. River shall at all times be maintained." Section 2 provided for the assessment of damages to all persons injured in their property by proceedings under the act. *Held,* upon the petition of the owner of a mill privilege on T. River, into which the waters of N. River

flow, that the statute limited the quantity of water which the city might divert; that maintaining the "natural flow" meant something more than leaving the outlet where it had previously been; and that the petitioner was entitled to be heard on the question of damages.

A petition by the owner of a mill privilege on a river against a city, which was authorized by statute to take the waters of the river or of a certain pond for a water supply, alleged that the city, acting under the authority of the statute, took the waters of the pond and pumped and diverted therefrom very large quantities of water, all of which would otherwise have flowed to the petitioner's mill privilege; that later the city, by an order of its city council, further took, under the provisions of the statute, the waters of the pond for the purpose of supplying its inhabitants with water; that ever since the city had continued, under these takings, to pump and divert in large quantities the waters of the pond which would otherwise have flowed to the petitioner's mill privilege; and that, by these takings and diversions of water, the petitioner had suffered great injury for which the city had failed to award him any damages. *Held,* that the petition did not purport to seek a recovery except for the water lawfully taken; and that a demurrer thereto could not be sustained on the ground that an action of tort was improperly joined with a petition for the assessment of damages.

PETITION to the Superior Court, for a jury to assess the damages caused to the petitioner by the acts of the respondent.

The petition alleged that the petitioner owned and operated, and prior to the acts complained of so owned and operated, a plant for the manufacture of cotton goods, in the city of Taunton, upon the Taunton River; that it owned and used in connection with such plant certain water privileges, easements, and rights in the Taunton River; that the respondent city, on or about April 22, 1893, acting under the provisions of St. 1875, c. 217, and all other acts in amendment thereof, took certain lands on the margin of Elders' Pond in the town of Lakeville, and on or about July 7, 1894, took other lands on the margin of Assowompsett Pond in Lakeville, at or near the source of the Nemasket River and where the waters of the pond flow into the Nemasket River, for the purpose of securing a water supply for its inhabitants; that on or about April 10, 1894, the respondent took, under said acts, the waters of Assowompsett Pond and pumped and diverted therefrom very large quantities of water, all of which waters so taken and diverted would otherwise have flowed into the Nemasket River and thence into the Taunton River, into which the entire waters of the Nemasket River empty, and thence to the dam and mill privilege of the petitioner; that on or about July 7, 1894, the respondent, by an order of its city council, further took, under the provisions of

the acts above named, the waters of Assowompsett Pond for the purpose of furnishing a water supply to its inhabitants; * that ever since April 10, 1894, the respondent had continued under said takings, by means of its engines and apparatus, to pump and divert in very large quantities the waters of Assowompsett Pond which would otherwise have flowed into Nemasket River, and thence into the Taunton River to the dam and mill privilege of the petitioner; that by these takings and diversion of the waters of Assowompsett Pond, which waters would otherwise, by the regular and natural flow of the watercourse of which they are a part, reach and flow over the premises of the petitioner, and which constituted a part of its property, to the full use and enjoyment of which it was entitled, the petitioner had suffered great injury and loss; that the petitioner had failed to agree with the respondent as to the amount of its damages so suffered, and the respondent had failed and refused to award any damages to it therefor; and that the petitioner was aggrieved by the doings of the respondent in the failure to estimate its damages; and prayed that the same might be assessed by a jury.

The respondent demurred to the petition, assigning as grounds of demurrer: 1. That the petitioner had "improperly joined in said petition a cause of action for a tort under the common law, and for a wrong under the statutes." 2. That if the petitioner suffered any damage, as alleged in the petition, "its action cannot be maintained in the form of this proceeding, but should be in the form of an action of tort at common law." 3. That the petition did not state a case which entitled the petitioner to damages.

In the Superior Court, the demurrer was sustained, and the petition dismissed; and the petitioner appealed to this court.

*J. F. Jackson*, for the petitioner.

*L. E. White*, for the respondent.

---

* " And it is further ordered by the city council of the city of Taunton, that the waters of said Assowompsett Pond in Middleborough and Lakeville in the county of Plymouth, and the waters which flow into said Assowompsett Pond, are hereby taken according to the terms and provisions of said Acts, and not otherwise, and to the extent that said waters may be held and taken as surplus waters and by way of storage thereof by means of dams as provided in said Acts, and no more."

KNOWLTON, J.    The principal question in this case is what construction shall be put upon the peculiar provisions of the St. 1875, c. 217.   This statute is entitled " An Act to provide the city of Taunton with pure water."   It authorizes the taking of " the waters of either Taunton River . . . or Elders' and Assowompsett Ponds," and contains elaborate provisions for acquiring lands necessary for maintaining dams and reservoirs, and for laying and maintaining conduits, pipes, drains, and other works.   It requires, in § 2, the payment of damages to. all persons injured in their property by proceedings under the act, and provides for the raising of money to defray the expenses incurred by the city in obtaining and distributing the water. In the first section is this language : " Provided, however, that if said city of Taunton take water from said Assowompsett Pond the said city shall construct and maintain a dam at the place where the Assowompsett Pond flows into Nemasket River, not exceeding two and one half feet in height above the mudsill · as it now exists at said place; and provided, further, that if said dam shall not retain sufficient water for one year's supply for the city of Taunton, then said city shall have the right to, and shall, raise said dam to such a height as will retain sufficient water for one year's supply for said city of Taunton.   It is also provided that the natural flow of said Assowompsett Pond into the Nemasket River shall at all times be maintained."

If the last sentence of this quotation stood alone, and if the words were given their ordinary meaning, it would forbid any diminution at any time of the quantity of water flowing from the pond into Nemasket River, and make it impossible for the city to supply itself from this source.   These words cannot have been intended to require the keeping of the waters of the pond and the flow from the pond always undiminished in quantity, notwithstanding the taking and use by the city.   We must give them a meaning that will not defeat the object of the statute. They must have been intended either merely to fix the place where the overflow of the water should be discharged from the pond without reference to the quantity, or they must, in connection with the preceding sentence, constitute a broad provision for the benefit of riparian proprietors on the stream below, under which the city, by the maintenance and use of the reser-

voir, may have a supply of water supposed to be sufficient, and at the same time be obliged to maintain the flow of the river at the height which is usual in times of ordinary water, when the current is not increased by a freshet, or by recent uncommonly heavy rains.

That the language was not intended merely to provide that the outlet for the discharge of the overflow of the pond should not be changed seems plain. If this had been the meaning of the Legislature, very different language would doubtless have been chosen, adapted to express it. The words " natural flow," in their ordinary signification, refer to the moving water itself, and not to the place where it is running. The word " maintained " points to a direct provision and to future action to produce the desired result, as distinguished from non-interference with an existing condition.

Moreover, the parties have treated this provision as a limitation of the quantity of water that the city can take, and a guaranty to the proprietors below that the quantity flowing in the river shall be such as is usual in ordinary times. The city, in its official action, assumed to take the waters " according to the terms and provisions of said Acts, and not otherwise, and to the extent that said waters may be held and taken as surplus waters and by way of storage thereof by means of dams as provided in said Acts, and no more." Its counsel contends that only the surplus water of the pond beyond what is necessary to maintain the ordinary flow into the river can be taken under the statute ; and the counsel for the petitioner does not suggest that the provision has reference merely to the place where the unused water shall be discharged, but contends, in the language of his brief, " that the Legislature had in mind the granting for a water supply, in this instance, of such waters as frequently run largely to waste in freshet seasons, and which, if stored up and this waste prevented, might perhaps in a sense properly be termed surplus waters." Aided by the interpretation of the parties, we have no hesitation in holding that the statute limits the quantity of water which the city may divert, and that maintaining the natural flow is something more than leaving the outlet where it had previously been.

The right to take and use the water is given with provisos.

If the city takes the water, it must maintain a dam at the place where the pond flows into the river, of a height which will retain water sufficient for one year's supply of the city. It must also at all times maintain the natural flow of the pond into the river. We must give this last provision an interpretation consistent with the manifest purpose of the Legislature. The statute was enacted more than twenty years ago, when the population of Taunton was smaller than it is now. When the supplemental act was passed (St. 1893, c. 402), very likely it appeared that the city had already obtained a large quantity of water from a source other than Assowompsett Pond. The provisions of the original statute indicate that, in the opinion of the Legislature, a quantity of water sufficient to supply the city for a year could easily be retained in Assowompsett Pond by erecting a dam at the outlet, and that this accumulation could be obtained by holding back that which ordinarily would run away in freshets and in times of uncommonly high water without being of use to anybody. It seems to have been the opinion of the Legislature that by appliances at the dam, the discharge of the water from the reservoir could be so regulated by the city as at all times to maintain the natural flow of the river as it would ordinarily be when the water was not raised above its usual height by thaws, freshets, or recent heavy rains. The requirement that a dam should be erected and a reservoir be maintained by the city as a condition to the exercise of its right could have had no other purpose than to provide for a flow of water to the proprietors upon the stream below, and the requirement that the natural flow shall be maintained can have reference to nothing else than the regulation of the discharge of water from the reservoir into the river, and to the limitation of the use of water by the city so as not to interfere with this flow.

The chief practical difficulty under the statute seems to be to determine from week to week how much water must be let down to maintain the natural flow within the meaning of the law. It may be that this difficulty is so great as to make further legislation desirable. But it need not trouble us in the present aspect of the case. The question before us arises upon the demurrer, and we are now called upon only to determine

whether there can be an assessment of damages under this petition. The trial may disclose facts which will enable the court to define the term " natural flow " more accurately than we can now define it upon the allegations of the petition, which give us no information in regard to the quantity of water that usually flows from the pond, or to the regularity or variableness of the flow.

We cannot say that the use of the water strictly in accordance with the statute will cause no actual damage to any of the proprietors below. Most of them probably will not be interfered with in any beneficial use to which they could have put the water if none had been taken. But others may have dams, reservoirs, or water rights upon the river which will be more or less affected in value by the diversion of water in times of freshet, or of uncommonly high water. Supplies which they might accumulate and use may be cut off by the reservoir dam at the pond, even though the natural flow of the water in ordinary times is always maintained. The petitioner is therefore entitled to be heard on the question of damages.

Although some of the allegations of the petition are broad enough to cover damages for the diversion of water beyond the quantity which the city had a right to take under the statute, we are of opinion that the petition as a whole does not purport to seek a recovery except for the water lawfully taken, and that the demurrer cannot be sustained on the ground that an action of tort is improperly joined with a petition for the assessment of damages.

*Demurrer overruled.*